IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Roberta Randall, Louise Randall and, William Randall, Minors by James E. Randall, their Father and next friend, et al., | )<br>)<br>)<br>) | C.A. No. 3:63-cv-1240 |
| vs. | )<br>)<br>) | **ORDER OF UNITARY STATUS AND DISMISSAL** |
| Sumter School District Number 2, Sumter, South Carolina, a public body corporate and Dan L. Reynolds, etc., et al. | )<br>)<br>)<br>)<br>) | |

This matter is before the court on the motion of Sumter School District (the District) for a declaration of unitary status and dismissal of the court's desegregation decree. The District and the Plaintiffs, by and through legal counsel, agree that the District operates as a racially unitary school system and that the court's desegregation decree and jurisdiction over this matter should be terminated.

### I. Factual and Procedural Background

The District was formed on July 1, 2011 by the consolidation of former School Districts No. 2 and No. 17 of Sumter County. District No. 2 was subject to a desegregation order. *Randall v. Sumter Sch. Dist. No. 2*, 232 F. Supp. 786 (E.D.S.C. 1964) (implementing desegregation order); *Randall v. Sumter Sch. Dist. No. 2*, 241 F. Supp. 787 (E.D.S.C. 1965) (modifying desegregation order). In 1963, a desegregation lawsuit was filed against District No. 2 seeking an injunction enjoining District No. 2 from: (1) operating a compulsory biracial school system; (2) maintaining a dual scheme or pattern of school zone or attendance area lines based on race or color; (3) assigning pupils in the District on the basis of race or color; (4) assigning teachers or school personnel on basis of race or color; (5) administering District affairs in a manner designed to maintain or support compulsory racially segregated schools; or, in the

alternative, seeking an order requiring District No. 2 to present a plan of reorganization of the schools in District No. 2 on a nonracial basis. *Randall v. Sumter Sch. Dist. No. 2*, 232 F. Supp. 786, 787 (E.D.S.C. 1964).

By order filed March 31, 1969, the federal District Court of South Carolina, sitting *en banc*, directed District 2 to submit to the Office of Education, United States Department of Health, Education and Welfare, a proposed plan reorganizing the District on a nonracial basis. District 2 did not reach an agreement with the Office of Education regarding its plan. Consequently, the Office of Education offered a plan for school year 1969–70 which would accomplish total integration and an alternative plan which would allow an orientation and preparation period for the 1969–70 school year and complete desegregation for the 1970–71 school year.

In its Order of July 15, 1969, the court ordered the implementation of the alternate two-year plan prepared by the Office of Education. *See* ECF No. 13-2, at 14–32. For the 1970–71 school year, the court ordered a detailed terminal plan. *See id.* at 30–31. Since the July 15, 1969 Order, District 2 has been subject to the terms and conditions of the Order, which the court's order of June 1985 modified to allow for the creation of an academic magnet school and a vocational center. There have been no formal challenges to the plan set forth in the July 15, 1969 Order or any formal allegations of District 2's noncompliance with the terms of the Order.

Similarly, District No. 17 desegregated under a voluntary desegregation plan agreement with the Office of Education in 1969, which was substantially modified by its May 6, 1975 agreement with the Office of Education. *See* ECF No. 13-3, at 20–23. District No. 17 continued to operate under that desegregation plan agreement. In 1991, District No. 17 changed attendance lines and added a new elementary school, Kingsbury Elementary School. Although the United

States Department of Education's Office for Civil Rights (OCR) did not approve these changes in 1991, OCR's October 20, 1998 memorandum regarding the District No. 17's desegregation efforts states that "OCR would have approved the zone." *See id.* at 38.

Subsequently, in 1998, District No. 17 received OCR's approval to add a third middle school, Chestnut Oaks Middle School, along with related attendance zone and programmatic changes, and the desegregation plan was modified accordingly at that time. *See id.* at 35–36. Then in 2006, District No. 17, again with OCR's approval, rezoned the attendance areas for Alice Drive Middle School and Bates Middle School. *See id.* at 25–27. Since the implementation of the 1975 desegregation plan, there have been no formal challenges to it or its subsequent modifications. Likewise, there have been no formal allegations of District No. 17's noncompliance with the plan.

Additionally, by way of demographic background, for the 1968–69 school year District No. 2 enrolled 11,005 students, of which 6,013, or 54.3%, were black and of which 5,052, or 45.7%, were white. *See* Affidavit of Randolph Bynum, ECF No. 13-4, at 6; *see also* ECF No. 13-2, at 21–22.[1]  Likewise, for the 1971–72 school year, District No. 17 enrolled 10,930 students, of which 5,498, or 50.3%, were black and of which 5,432, or 49.7%, were white. *See* Affidavit of Randolph Bynum, ECF No. 13-4, at 6; *see also* ECF No. 13-3, at 3. For the 2012–13 school year, the Sumter School District enrolled 10,308 black students, 5,366 white students,

---

[1] The Affidavit of Randolph Bynum includes a table which sets forth demographic data regarding the composition of the student body of the District in 2012–13 and the composition of the student bodies of District Nos. 2 and 17 at the time of the July 15, 1969 Order. *See* ECF No. 13-4, at 7–8. Counsel for Defendants informed the court that this table contains several editorial errors. For example, the table omits data for Shaw Junior High School, which pursuant to the court's Order of July 15, 1969 became an elementary school, *see* ECF No. 13-2, at 31. This school was subsequently renovated, renamed in 1996, and currently operates as Oakland Primary School. Additionally, the table states that the number of white students enrolled at Lakewood High School in 2012–13 is 453. In fact, the correct number is 435. Finally, McLaurin School was completely closed for the 1976–77 school year, not the 1975–76 school year. *See* ECF No. 13-3, at 21–22. This Order is based on and reflects the corrected demographic data.

3

and 1,100 students of other races, totaling 16,774 students. Of these, 61.45% are black students and 31.99% are white students. *See* Affidavit of Randolph Bynum, ECF No. 13-4, at 6.

The general benchmark set forth in District No. 17's 1975 desegregation plan agreement with OCR is that schools be zoned "so that the racial ratio at each school will not exceed the racial ratio of [District No. 17] by +/- 20 percentage points." ECF No. 13-3, at 22. Although this guideline is less than clear, the court takes this to mean that the percentage of black students at each school within the District should not differ from the percentage of black students in the District as a whole by more than 20 percentage points. Likewise for the percentage of white students at each school within the district. Thus, for example, if the District as a whole is 61.45% black and 31.99% white, the percentage of black students at any particular school should only vary between 41.45% and 81.45%.

As of the 2012–13 school year, 16 of the District's 26 schools are within these parameters.[2] However, with respect to the 10 schools not meeting the +/- 20% benchmark, only three (Crosswell Drive Elementary, Lemira Elementary, and Chestnut Oaks Middle) do not reflect greater levels of racial integration. In addition, 3 others of the 10 schools not meeting the +/- 20% benchmark are technically noncompliant but in fact are relatively racially balanced as a result of the noncompliance. Specifically, Alice Drive Elementary is comprised of 52.43% white students and 39.32% black students; Manchester Elementary is comprised of 54.96% white students and 39.22% black students; and Pocalla Springs Elementary is comprised of 53.99% white students and 38.72% black students.

---

[2] The 10 schools not meeting the +/- 20% benchmark include Crosswell Drive Elementary, Lemira Elementary, Chestnut Oaks Middle, Mayewood Middle, Delaine Elementary, Rafting Creek Elementary, R.E. Davis Elementary, Alice Drive Elementary, Manchester Elementary, and Pocalla Springs Elementary.

Moreover, the District has in place numerous antidiscrimination policies reflecting both its commitment to desegregation, maintaining a racially unitary school system, and protecting faculty, staff, and students from racial discrimination, including Polices AC (Nondiscrimination/Equal Opportunity), GBA (Open Hiring/Equal Employment Opportunity), JA (Student Policies Goals/Priority Objectives), JB (Equal Educational Opportunity/Nondiscrimination), and JI (Student Rights and Responsibilities).  Finally, it is important to highlight that five of the District's seven board of education members are black and its superintendent is black.

Following the consolidation of Districts No. 2 and No. 17 on July 1, 2011, the District asked the court to consolidate its desegregation obligations under the court's supervision, as set forth in the District's Motion for Modification of Desegregation Order filed on October 12, 2011. The court granted the motion and the District's desegregation obligations are consolidated under the jurisdiction and supervision of this court.

## II.  Legal Standard

The District is seeking a declaration of unitary status.  A unitary status determination involves an assessment of whether the District has complied in good faith with the desegregation decree since it was entered and whether the vestiges of past discrimination have been eliminated to the extent practicable.  *Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 249–50 (1991).  The Supreme Court has not narrowly defined the term "unitary."  *Freeman v. Pitts*, 503 U.S. 467, 487 (1992).  However, a school system must be declared unitary when it no longer discriminates between students on the basis of race.  *Green v. County School Bd. of New Kent County, Va.*, 391 U.S. 430, 442 (1968); *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 318 (4th Cir. 2001).

The Fourth Circuit recently discussed the issues involved in evaluating the unitary status of a school system in *Everett v. Pitt County Board of Education*:

> The "term 'unitary' is not a precise concept . . . [but instead] describe[s] a school system which has been brought into compliance with the command of the Constitution." *Freeman*, 503 U.S. at 487, 112 S. Ct. 1430 (quotation marks omitted). Pursuant to *Green*, 391 U.S. 430, 88 S. Ct. 1689, to achieve unitary status a school district must eliminate, to the extent practicable, the vestiges of de jure segregation in six areas: (1) student assignment, (2) faculty assignment, (3) staff assignment, (4) transportation, (5) extracurricular activities, and (6) facilities. A declaration of unitary status by a district court is appropriate after a school district demonstrates, by way of the *Green* factors, that "[first,] the [school] Board ha[s] complied in good faith with the desegregation [order] since it was entered, and [second,] . . . the vestiges of past [de jure] discrimination ha[ve] been eliminated to the extent practicable." *Dowell*, 498 U.S. at 249–50, 111 S. Ct. 630 (footnote omitted).

*Everett v. Pitt County Board of Education*, 678 F.3d 281, 289 n.6 (4th Cir. 2012). The standard of unitariness has been developed by the courts because "it conveys the central idea that a school district that was once a dual system must be examined in all of its facets, both when a remedy is ordered and in the later phases of desegregation when the question is whether the district courts' remedial control ought to be . . . withdrawn." *Freeman*, 503 U.S. at 486.

The District bears the burden of proof in showing it has achieved unitary status. *Belk*, 269 F.3d at 318.

### III.  Findings of Fact

#### A.  Student Assignment

Since implementation of the July 15, 1969 Order and the May 6, 1975 desegregation agreement, black and white students in District No. 2 and District No. 17 have been assigned to schools on a nondiscriminatory basis. Geographical attendance zones have been drawn pursuant to the court's desegregation orders, the agreements with the OCR, or another non-discriminatory basis. The District currently operates 26 schools in addition to the two alternative school programs. The enrollment for the 2012–13 school year is 16,774 students; 61.45% of the student

body is black, 31.99% is white, and 6.56% is comprised of other races. The table which follows provides a comparison of the composition of the current student body and the student body at approximately the time of the court's July 15, 1969 Order.

| School (Former District) | School Years 1968–70[3] | | School Year 2012–13 | | |
|---|---|---|---|---|---|
| | No. Black | No. White | No. Black | No. White | No. Other |
| **ELEMENTARY SCHOOLS** | | | | | |
| Alice Drive Elementary (17) | 52 | 583 | 267 | 356 | 56 |
| Cherryvale Elementary (2) | 32 | 589 | 268 | 90 | 24 |
| Crosswell Drive Elementary (17) | 134 | 645 | 482 | 49 | 33 |
| Delaine Elementary (2) | 388 | 0 | 149 | 20 | 11 |
| High Hills Elementary (2) [Opened in 1974] | N/A | N/A | 229 | 169 | 67 |
| Kingsbury Elementary (17) [Opened in 1991] | N/A | N/A | 422 | 282 | 33 |
| Lemira Elementary (17) | 79 | 387 | 535 | 44 | 39 |
| Manchester Elementary (2) | 1188 | 0 | 182 | 255 | 27 |
| Millwood Elementary (17) | 104 | 657 | 359 | 285 | 31 |
| Oakland Primary (2) [Opened in 1996. Previously operated as Shaw Junior High School] | N/A | N/A | 313 | 250 | 113 |
| Pocalla Springs Elementary (2) [Opened in 1991] | N/A | N/A | 340 | 474 | 64 |
| Rafting Creek Elementary (2) | 458 | 0 | 179 | 12 | 10 |
| RE Davis Elementary (2) [Opened in 1996] | N/A | N/A | 280 | 26 | 18 |
| Shaw Heights Elementary (2) | 89 | 1127 | 227 | 178 | 74 |
| Wilder Elementary (17) | 297 | 101 | 336 | 88 | 25 |
| Willow Drive Elementary (17) | 73 | 479 | 460 | 130 | 35 |
| | | | | | |
| **MIDDLE SCHOOLS** | | | | | |
| Alice Drive Middle (17) [Opened in 1975–76] | N/A | N/A | 424 | 298 | 31 |
| Bates Middle (17) [Opened in 1975–76] | N/A | N/A | 499 | 225 | 29 |
| Chestnut Oaks Middle (17) [Opened in 1999–00] | N/A | N/A | 417 | 25 | 21 |
| Ebenezer Middle (2) | 1561 | 0 | 264 | 70 | 32 |
| Furman Middle (2) | 14 | 837 | 443 | 417 | 60 |
| Hillcrest Middle (2) | 272 | 1406 | 196 | 173 | 47 |

---

[3] Unless otherwise noted, District No. 2 numbers are for 1968–69 school year and District No. 17 numbers for the 1969–70 school year.

| School (Former District) | School Years 1968–70[3] | | School Year 2012–13 | | |
|---|---|---|---|---|---|
| | No. Black | No. White | No. Black | No. White | No. Other |
| Mayewood Middle (2) | 24 | 712 | 141 | 11 | 2 |
| | | | | | |
| **HIGH SCHOOLS** | | | | | |
| Crestwood High (2) [Opened in 1996] | N/A | N/A | 782 | 263 | 83 |
| Lakewood High (2) [Opened in 1996] | N/A | N/A | 619 | 435 | 46 |
| Sumter High (17) [Opened in 1976–77] | N/A | N/A | 1,495 | 741 | 89 |
| | | | | | |
| **CLOSED SCHOOLS** | | | | | |
| Central (17) | 112 | 474 | Closed 1976–77 School Year | | |
| Moore (17) | 382 | 0 | Closed 1975–76 School Year | | |
| Savage-Glover (17) | 721 | 3 | Closed 1976–77 School Year | | |
| Stonehill (17) | 727 | 0 | Closed 1976–77 School Year | | |
| Guignard Drive (17) | 364 | 1 | Closed 1972–73 School Year | | |
| Winn (17) | 180 | 0 | Closed 1972–73 School Year | | |
| Eastern (2) | 1296 | 0 | Closed 1971–72 School Year | | |
| St. John Elementary (2) | 332 | 0 | Closed 2001–02 School Year | | |
| Mayesville Institute (2) | 323 | 0 | Closed 2000–01 School Year | | |
| McLaurin (17) | Unavailable[4] | Unavailable | Closed 1976–77 School Year | | |
| Shaw Junior High School (2) | 36 | 381 | Operating as Oakland Primary School | | |

### B. Faculty and Staff

During the 2012–13 school year, the District employed 2,447 faculty and staff, of which 1,280 (52%) are black. Each of the schools employ both black and white teachers and staff. In addition, other administrative staff employed by the District are hired and assigned on a non-racial basis.

---

[4] The Final Decision of the Reviewing Authority dated October 7, 1974, from which these data originate, only includes school-specific (as opposed to District-wide) data for certain elementary schools in District No. 17. *See* ECF No. 13-3, at 3. Unfortunately, this is the only reliable source of student demographic data for District No. 17 during the relevant time period counsel for the parties have been able to locate.

### C. Extracurricular Activities

The District does not have any policies or practices that prevent or inhibit white or black students from participating in extracurricular activities. Students of all races are given an opportunity to participate in the extracurricular activities of the District, including sports and student government. Students are selected for and participate in extracurricular activities on a non-racial, non-discriminatory basis.

### D. Transportation

The District establishes school bus routes and transports all students living on the routes on a non-racial, non-discriminatory basis, and the District offers transportation to students without regard to race.

### E. Facilities

The court's 1969 Order concerning District No. 2 provides with respect to facilities that:

> School officials, to extent consistent with proper operation of the school system as a whole shall locate any new school and substantially expand any existing school with the objective of eradicating the vestiges of the dual system.

ECF No. 13-2, at 29. Similarly, District No. 17's 1975 desegregation plan provides that the racial composition of District schools will not exceed the racial ratio of the District by +/- 20 percentage points. ECF No. 13-3, at 22.

The District's facilities have been developed and/or expanded since 1969 with the objective of eradicating the vestiges of the prior de jure segregated system and in an effort to ensure the desegregation of the District's schools. The District has not taken any action in regard to location of new schools or expansion of existing facilities that has resulted in or fostered the recurrence or continuation of a racially dual school system.

With regard to former District No. 2, the court in its 1985 desegregation order noted "[s]ince the July 15, 1969, order, Sumter County School District Two has been subject to the

9

terms and provisions of the order. There have been no formal challenges to it, nor any formal allegations of noncompliance." Since 1985, there likewise have been no challenges or formal allegations of the former District No. 2's noncompliance with the court's desegregation decree. With regard to former District No. 17's compliance with its desegregation plan with OCR, District 17 has consulted with OCR regarding the establishment and/or expansion of school facilities, and OCR ultimately has approved such school facility expansions.

### IV.  Conclusions of Law

An initial touchstone in determining whether the District has complied with its desegregation obligations is the degree of racial imbalance in the District,

> that is to say a comparison of the proportion of majority to minority students in individual schools with the proportions of the races in the district as a whole. This inquiry is fundamental, for under the former *de jure* regimes racial exclusion was both the means and the end of a policy motivated by disparagement of, or hostility towards, the disfavored race.

*Freeman*, 503 U.S. at 474. Here, due to the District's careful attention to school attendance zones, there is no racial exclusion from any of the District's schools, and the proportion of black to white students at each school is reasonably consistent in light of demographic factors. The District's schools are generally within +/- 20% of the proportions of blacks and whites enrolled in the District as a whole. The table included above reflects the proportionate nature of the majority of the District's schools with regard to the black and white student enrollment and as compared to the District's student racial composition as a whole, which is approximately 61% black and approximately 32% white. Although as noted above 10 of the District's 26 schools do not meet the +/- 20% benchmark, 7 of these reflect greater levels of racial integration, and 3 are actually relatively racially balanced as a result of their noncompliance with the benchmark.

Notably, it appears that most of the current racial imbalance resulted from demographic shifts in population (particularly a decrease in white student enrollment) and parents' choices to

10

send their children to private schools. *See* Affidavit of Randolph Bynum, ECF No. 13-4, at 6. The October 20, 1998 memorandum by OCR specifically discusses private school competition and demographics, noting that 1,000 students from the system attend private schools. ECF No. 13-3, at 39. This memorandum also states that the school system's percentage of black students is increasing District-wide, more so to the east side of Sumter, South Carolina. *Id.* In addition, the March 24, 2006 record of contact from OCR reflects the concerns of Lamar Atkins, the former Superintendent of District 17, about the expansion of a housing development having high priced homes typically purchased by white families, "white flight," and dropping white enrollment. *Id.* at 27.

The demographic data are consistent with these observations. In almost all cases where significant racial disparity exists today in the District's schools, it appears that a dramatic drop in white student enrollment is the primary driver of racial imbalance, not discrimination. For example, in the 1969–70 school year, Crosswell Drive Elementary had 82.8% white students and 17.2% black students. In the 2012–13 school year, however, Crosswell Drive Elementary had 8.7% white students and 85.5% black students. Likewise, Lemira Elementary was 83.0% white and 17.0% black in 1969–70, but it was 86.6% black and 7.1% white in 2012–13. Also, at Mayewood Middle, white enrollment declined from 96.7% in 1968–69 to 7.1% in 2012–13, white black student enrollment increased from 3.3% in 1968–69 to 91.6% in 2012–13. With respect to Delaine Elementary, Rafting Creek Elementary, and R. E. Davis Elementary, white student enrollment was never significantly large, and the schools' overall population has been decreasing as a result of demographic changes. Under these circumstances, it cannot be assumed racial disparities in enrollment are vestiges of past discrimination. *Freeman*, 503 U.S. at 494–95; *Belk*, 269 F.3d at 322–23.

11

Based on this student data, it is clear that the District has effectively complied with the court's desegregation orders as well as its agreements with OCR.  Further, the District has both achieved and maintained reasonable racial proportionality in its schools to the extent practicable, in light of demographic changes.

With respect to the other *Green* factors, the District's faculty and staff are assigned to schools without regard to race, and all schools have white and black faculty and staff.  Regarding transportation, extracurricular activities, and facilities, neither the desegregation orders nor the OCR plan address these issues specifically.  The District does not discriminate in these areas, and no contention has been asserted that vestiges of prior de jure discrimination exist with respect to these factors.  Further, with regard to all of these factors except facilities, no concerns have been raised with the court or OCR over the past forty years.  The issues with facilities were resolved with OCR in connection with District No. 17 building Kingsbury Elementary School and District No. 17's middle schools.  It appears to this court that equal educational opportunities exist for all students in the District's schools.  Accordingly, the District has shown any vestiges of prior discrimination relative to the *Green* factors have been eliminated to the extent practicable.

## V.  Conclusion

As explained in *Freeman* and *Belk*, returning local control over schools is important and is the goal of a desegregation order.  *Freeman*, 503 U.S. at 490–91; *Belk*, 269 F.3d at 318.  For the reasons discussed herein, the District should have full local control over all aspects of its schools.  The District has complied in good faith with its desegregation obligations, and the court hereby declares the District to be racially unitary, dissolves the desegregation order, and returns the District to local governance.

The court further hereby finds that the District has met the legal standards for a

declaration of unitary status and that it is entitled to dismissal of this action.  Accordingly, it is hereby ORDERED that all prior injunctions and mandatory desegregation agreements in this case are DISSOLVED, jurisdiction is TERMINATED, and this case is DISMISSED.

    IT IS SO ORDERED.

July 18, 2013                                  Joseph F. Anderson, Jr.
Columbia, South Carolina               United States District Judge